**DAYTONA GRAND, INC. d/b/a Lollipop's Gentlemen's Club, a Florida corporation, Miles Weiss and John Doe, Plaintiffs,**

v.

**CITY OF DAYTONA BEACH, FLORIDA, a municipal corporation, Defendant.**

No. 6:02–CV–1469ORL28KRS.

United States District Court, M.D. Florida, Orlando Division.

Jan. 20, 2006.

Daniel R. Aaronson, James S. Benjamin, Lead Counsel, Benjamin & Aaronson, P.A., Ft. Lauderdale, FL, Brett Hartley, Drymonis & Hartley, P.A., Daytona Beach, FL, for Plaintiffs.

Marie Simone Hartman, City of Daytona Beach, Daytona Beach, FL, for Defendant.

an analysis of Florida law would yield a different result.

## ORDER

ANTOON, District Judge.

Plaintiffs Daytona Grand, Inc., Miles Weiss, and John Doe ("Plaintiffs") operate Lollipop's Gentlemen's Club ("Lollipop's"), a nude dancing establishment located in Daytona Beach, Florida. Plaintiffs brought the instant action alleging that Defendant City of Daytona Beach's ("the City") Alcohol and Nudity Ordinance[1] (hereinafter "Ordinance 81–334"), and Public Nudity Ordinance (hereinafter "Ordinance 02–496"[2]) violate the First and Fourteenth Amendments of the United States Constitution. In the alternative, Plaintiffs claim that they fall within an exemption contained in Ordinance 02–496 for bona fide live performances.

Plaintiffs also brought a claim challenging the constitutionality of the City's scheme for zoning adult entertainment establishments. The parties filed cross-motions for summary judgment on this claim, which the Court resolved in favor of the City on December 1, 2004.[3] This case proceeded to trial on the remaining issues: (1) whether the City put forth sufficient evidence justifying the burdens that Ordinances 81–334 and 02–496 place on the erotic expression of nude dancing establishments in Daytona Beach; and (2) whether Plaintiffs are exempt from Ordinance 02–496 because the dances at Lollipop's are "bona fide live ... performance[s] ... wherein such nudity is expressive conduct incidental to and necessary for the conveyance or communication of a genuine message or public expression, and is not a guise or pretense utilized to exploit nudity for profit or commercial gain."[4] The Court held a six-day bench trial on these issues and now, in accordance with Federal Rule of Civil Procedure 52, issues the following opinion as its findings of fact and conclusions of law.

## I. BACKGROUND

In 1981, the City enacted Ordinance 81–334 together with adult business zoning regulations as part of a twofold approach to addressing what the City perceived to be the deleterious effects of adult businesses. While Ordinance 81–334 prohibited nudity and sexual conduct in alcohol-serving establishments,[5] the City's zoning

1. Def.'s Trial Ex. 1, Ord. No. 81–334 (codified as Code § 10–6) (hereinafter cited as "Ord. 81–334").

2. Ordinance 02–496 was subsequently amended by Ordinance 03–375. *See* Def.'s Trial Ex. 2, Ord. No. 02–496 (hereinafter cited as "Ord. 02–496"); Def.'s Trial Ex. 3, Ord. No. 03–375 (hereinafter cited as "Ord. 03–375").

3. Order Denying Plaintiffs' Motion for Partial Summary Judgment, Granting in Part and Denying in Part Defendant's Motion for Summary Judgment, Doc. 119.

4. Ord. 02–496, § 62–184(a)(2)(exceptions).

5. Ordinance 81–334 provides:

   **Nudity, sexual conduct prohibited.**
   (a) No person shall expose to public view such person's genitals, pubic area, vulva, anus, anal cleft or cleavage or buttocks or any simulation thereof in an establishment dealing in alcoholic beverages.
   (b) No female person shall expose to public view any portion of her breasts below the top of the areola or any simulation thereof in an establishment dealing in alcoholic beverages.
   (c) No person maintaining, owning, or operating an establishment dealing in alcoholic beverages shall suffer or permit any person to expose to public view such person's genitals, pubic area, vulva, anus, anal cleft or cleavage or buttocks or simulation thereof within the establishment dealing in alcoholic beverages.
   (d) No person maintaining, owning, or operating an establishment dealing in alcoholic beverages shall suffer or permit any female person to expose to public view any portion of her breasts below the top of the areola or any simulation thereof within the establishment dealing in alcoholic beverages.

regulations designated certain districts as the only locations in which "adult theaters" could open as a matter of right.[6]

The City's support for the ordinances mainly consisted of "legislative findings of the city commission and supporting reports and documents provided by the police, indicating that nude dancing . . . contributes to criminal activities." *City of Daytona Beach v. Del Percio*, 476 So.2d 197, 204 (Fla.1985). In addition, the City relied on the Supreme Court's decisions in *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), and *New York State Liquor Authority v. Bellanca*, 452 U.S. 714, 101 S.Ct. 2599, 69 L.Ed.2d 357 (1981), for the proposition that municipalities "may prohibit various forms of actual and simulated nude and sexual conduct and depiction thereof within establishments dealing in alcoholic beverages." Ord. 81–334 (preamble).

The City's theory that adult entertainment establishments are the source of crime and other deleterious effects in Daytona Beach was first put to the test nearly twenty years ago in *Function Junction, Inc. v. City of Daytona Beach*, 705 F.Supp. 544, 546–48 (M.D.Fla.1987). Three adult entertainment establishments brought suit challenging the City's zoning restrictions on the location of adult theaters. In defense of its zoning scheme, the City presented the testimony of Gerald Langston ("Mr. Langston") and David Smith ("Mr. Smith"). Mr. Langston, an urban planner, testified that prior to enacting the ordinances, he coordinated a task study group which determined that significant portions of Daytona Beach suffered from blight. He also testified, based on his education, experience, and personal knowledge of blight, as well as his consideration of urban blight studies in Detroit and Boston, that adult businesses were a cause of the blight. *Id.* at 547. Mr. Smith, an assistant state attorney, concurred with Mr. Langston's assessment and also testified that adult businesses were a source of drug and prostitution activity. *Id.* at 548. Aided by the testimony of Mr. Langston and Mr. Smith, the court in *Function Junction* concluded that there was a sufficient evidentiary basis for the City's zoning restrictions.

The City later became concerned that "certain businesses [were] evading the purpose of [Ordinance 81–334] by serving alcohol and presenting nude entertainment in the same building, with a separation between the areas where alcohol is served and nudity occurs but providing for access between the two areas."[7] At the same

---

(e) No person shall engage in and no person maintaining, owning, or operating an establishment dealing in alcoholic beverages shall suffer or permit any sexual intercourse; masturbation; sodomy; bestiality; oral copulation; flagellation; sexual act which is prohibited by law; touching, caressing or fondling of the breasts, buttocks, anus or genitals; or the simulation thereof within an establishment dealing in alcoholic beverages.

(f) No person shall cause and no person maintaining, owning or operating an establishment dealing in alcoholic beverages shall suffer or permit the exposition of any graphic representation, including pictures or the projection of film, which depicts human genitals; pubic area; vulva; anus; anal cleft or cleavage; buttocks; female breasts below the top of the areola; sexual intercourse; masturbation; sodomy; bestiality; oral copulation; flagellation; sexual act prohibited by law; touching, caressing or fondling of the breasts, buttocks, anus, or genitals; or any simulation thereof within any establishment dealing in alcoholic beverages.

6. The Land Development Code of City of Daytona Beach defines an "adult theater," in pertinent part, as an establishment "which exhibits any motion picture, exhibition, live show, representation, or other presentation which, in whole or in part, depicts nudity." Daytona Beach Land Development Code, Art. 2, § 3.1.

7. Ord. 02–496 (preamble).

time, the City was also concerned that the occurrence of lewd and lascivious acts within adult entertainment establishments was on the increase.[8] Based in part on these concerns, the City enacted Ordinance 02–496, which provides:

(a) It shall be unlawful for any person ten years of age or older to recklessly, knowingly, or intentionally appear in a public place, or to recklessly, knowingly, or intentionally cause or permit another person ten years of age or older to appear in a public place in a state of dress or undress such that any of the following body parts or portions thereof are exposed to view or are covered with anything other than a full and opaque covering which completely covers all of the described area:

(1) The male or female genitals, pubic area, or anal cleavage.

(2) The nipple and areola of the female breast; and in addition at least one-half of that outside surface area of the breast located below the top of the areola, which area shall be reasonably compact and contiguous to the areola.

(3) One-third of the male or female buttocks centered over the cleavage of the buttocks for the length of the cleavage. This area is more particularly described as that portion of the buttocks which lies between the top and bottom of the buttocks, and between two imaginary straight lines, one on each side of the anus and each line being located one-third of the distance from the anus to the outside perpendicular line defining the buttocks, and each line being perpendicular to the ground and to the horizontal lines defining the buttocks.

(b) It shall be unlawful for any person to recklessly, knowingly, or intentionally appear in a public place, or to recklessly, knowingly, or intentionally cause or permit another person to appear in a public place in a manner as to show or display the covered male genitals in a discernibly turgid state.

(c) Attire which is insufficient to comply with these requirements includes but is not limited to those items commonly known as G-strings, T-backs, dental floss, and thongs.

Ord. 02–496, § 62–183.

Less than a year after the City enacted Ordinance 02–496, the Eleventh Circuit issued an opinion that, among other things, called into question whether a nudity ordinance could ever constitutionally require nude dancers to wear more than G-strings, thongs, and pasties. *Peek–A–Boo Lounge of Bradenton, Inc. v. Manatee County*, 337 F.3d 1251, 1273 (11th Cir.2003) (citing *City of Erie v. Pap's A.M.*, 529 U.S. 277, 301, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000)). Shortly thereafter, the City enacted Ordinance 03–375, which amended Ordinance 02–496 to allow nude dancers to wear G-strings and pasties so long as the adult theaters in which they dance are not located within 500 feet of an establishment serving alcoholic beverages.[9] In addition to the evidence that it relied on in enacting Ordinance 02–496, the City's support for Ordinance 03–375 included Mr. Langston and Mr. Smith's testimony from *Function Junction*; prior court decisions upholding the City's ordinances; a series of studies

---

**8.** *Id.*

**9.** Section 14 of Ordinance 02–496 and Section 9 of Ord. No. 03–375 are codified in Article VI of the Daytona Beach Code of Ordinances. Ord. No. 02–496, § 14, 10–2–2002; Ord. No. 03–375, § 9, 8–20–2003.

authored by Dr. William George ("Dr. George") which discuss the combined effects of alcohol consumption and exposure to erotic stimuli; and a first-person account published in the *New Statesman* magazine describing the effects of viewing erotica in a bar. Ord. 03–375 (preamble).

## II. CLARIFICATION OF ISSUES FOR TRIAL AS SET FORTH IN THE COURT'S DECEMBER 1, 2004 SUMMARY JUDGMENT ORDER

Apart from dispensing with Plaintiffs' challenge to the City's zoning regulations, the Court's summary judgment order also clarified the issues critical to trying Plaintiffs' remaining claims. As more fully explained below, the Court determined that the key issue for trial on Plaintiffs' constitutional challenges to Ordinances 81–334 and 02–496 was whether the City could justify its reasons for enacting the two ordinances. The Court also determined that issues of material fact remained as to whether the erotic performances that Plaintiffs offer are "bona fide live ... performance[s] ... wherein such nudity is expressive conduct incidental to and necessary for the conveyance or communication of a genuine message or public expression, and is not a guise or pretense utilized to exploit nudity for profit or commercial gain."

### A. PLAINTIFFS' CONSTITUTIONAL CLAIMS

The Court's decision to deny the City's motion for summary judgment on Plaintiffs' constitutional challenges to Ordinances 81–334 and 02–496 was primarily guided by the Supreme Court's decision in *City of Los Angeles v. Alameda Books*, 535

U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002), and the Eleventh Circuit's decision in *Peek–A–Boo*. Under the analytical framework set forth in *Peek–A–Boo*, the threshold inquiry in reviewing a claim challenging an ordinance regulating erotic expression is whether the ordinance is a zoning ordinance or a general public nudity ordinance. 337 F.3d at 1264–65.[10] While the proper test for analyzing zoning ordinances is the standard for time, place, and manner regulations set forth in *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46–50, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), *id.* at 1264, "content-neutral" nudity ordinances are analyzed under the four-part test established in *United States v. O'Brien*, 391 U.S. 367, 367–77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

■ The parties agreed in their motions for summary judgment that Ordinances 81–334 and 02–496 are content-neutral nudity ordinances which require analysis under the *O'Brien* test. The *O'Brien* test provides that "public nudity ordinances [which] incidentally impact protected expression should be upheld if they (1) are within the constitutional power of the government to enact; (2) further a substantial government interest; (3) are unrelated to the suppression of free expression; and (4) restrict First Amendment freedoms no greater than necessary to further the government interest." 337 F.3d at 1264. As in *Peek–A–Boo*, the parties' dispute on summary judgment in this case centered on the second and fourth elements of the *O'Brien* test. In its summary judgment order, the Court rejected Plaintiffs' claim that the City's ordinances violate the fourth prong of the *O'Brien* test, but de-

---

**10.** The *Peek–A–Boo* court explained that, although the Supreme Court "has sometimes collapsed the two categories into a single, overarching category of regulatory action targeting the negative 'secondary effects' of non-obscene adult entertainment," the analytical frameworks for evaluating the two types of regulations vary slightly. 337 F.3d at 1255, 1264–65.

termined that material issues remained for trial on the question of whether the City's public nudity ordinances further a substantial government interest.

### 1. O'Brien's requirement of furthering a substantial government interest

O'Brien's requirement that a content-neutral nudity ordinance further a substantial government interest has long depended on the degree to which the ordinance is supported by evidence of a causal link between erotic expression and adverse "secondary effects." This evidentiary burden was, until very recently, a decidedly "weak one," requiring only that a municipality rely on evidence that it reasonably believes to be relevant to the problem of "secondary effects," even if such evidence is merely that which other municipalities have relied on in the past. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 296–97, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). In *Alameda Books,* the Supreme Court raised the bar somewhat with its admonition that, although "a municipality may rely on any evidence that is reasonably believed to be relevant for demonstrating a connection between speech and a substantial, independent government interest," a municipality cannot "get away with shoddy data or reasoning." 535 U.S. at 438, 122 S.Ct. 1728 (citation and internal quotations omitted). Instead, "[t]he municipality's evidence must fairly support the municipality's rationale for its ordinance." *Id.*

Relying on *Alameda Books,* the Eleventh Circuit in *Peek–A–Boo* adopted the following burden-shifting approach for analyzing whether a nudity ordinance is sufficiently supported by evidence of "secondary effects": (1) the municipality must demonstrate that it relied on evidence that it reasonably believed to support a connection between erotic expression and adverse secondary effects; (2) plaintiffs may cast direct doubt on the municipality's rationale for enacting the ordinance, "'either by demonstrating that the municipality's evidence does not support its rationale, or by furnishing evidence that disputes the municipality's factual findings'"; and (3) assuming that the plaintiffs cast direct doubt on the municipality's rationale, "'the burden shifts back to the [municipality] to supplement the record with evidence renewing support for a theory that justifies its [ordinance].'" *Id.* at 1265, 1269 (quoting *Alameda Books,* 535 U.S. at 438–39, 122 S.Ct. 1728).[11]

### 2. Application of O'Brien's second prong

In support of its motion for partial summary judgment, Plaintiffs submitted expert studies analyzing the evidentiary predicates for Ordinances 81–334 and 02–496. The studies reached two basic conclusions: (1) that the findings and reason-

---

11. In *Peek–A–Boo,* the Eleventh Circuit found that, while the City satisfied its pre-enactment burden, the plaintiffs succeeded in casting "direct doubt" on the City's rationale for enacting the challenged ordinance with evidence that included "three expert studies specifically addressing local conditions ... which purported to show that there was no evidence connecting their businesses with negative secondary effects." 337 F.3d at 1270. The Eleventh Circuit also emphasized, moreover, that the City did not attempt "to counter the [plaintiffs'] evidence with local studies of its own" and thus failed to create "a battle of competing experts." *Id.* at 1272. In remanding the case, the Eleventh Circuit instructed the district court to "decide by a preponderance of the available evidence ... whether there remains credible evidence upon which the [City] could reasonably rely in concluding that the ordinance would combat the secondary effects of adult entertainment establishments." *Id.* at 1273. Finally, the court noted that, while the burden was on the county to renew the evidentiary basis for its ordinance, the district court was to take care "not to substitute its own judgment for that of the [City]." *Id.*

ing relied upon by the City in enacting its ordinances were "shoddy"; and (2) that there is "no evidence of negative effects in the form of crime, especially sex crimes, stemming from the adult cabarets that feature nudity or topless entertainment in Daytona Beach" nor any evidence that the "appearance of persons in the nude or semi nude in public places such as adult cabarets ... increased incidents of lewd and lascivious behavior, prostitution or sexual assaults and batteries." Pl.'s Trial Ex. 1, Amended Experts' Reports on Secondary Effects Studies for Daytona Beach Ordinances (hereinafter cited as "Expert Reports"), at 2–3, 91, 188–89.

In response to Plaintiffs' studies, the City, rather than submitting studies of its own, simply submitted affidavits critiquing the methodology of Plaintiffs' experts. *See* Docs. 92 & 94. While failing to create "a battle of competing experts," the City's affidavits sufficed to create an issue for trial on the methodological soundness of Plaintiffs' studies. Doc. 119 at 22.

## B. PLAINTIFFS' CLAIM OF EXEMPTION FROM ORDINANCE 02–496

Ordinance 02–496 provides that

The offense of public nudity or exposure ... shall not occur ... [w]hen the conduct of being nude cannot constitutionally be prohibited by this section because it constitutes a part of a bona fide live communication, demonstration, or performance by such person wherein such nudity is expressive conduct incidental to and necessary for the conveyance or communication of a genuine message or public expression, and is not a guise or pretense utilized to exploit nudity for profit or commercial gain....

Ord. 02–496, § 62–184(a)(2).[12] In opposition to the City's motion for summary judgment, Plaintiffs presented evidence in the form of affidavits that the dance routines of Lollipop's dancers are "a form of iconoclastic expression intended to make individuals think about issues involving sexuality, nudity and the role of women in society." *Id.* The City, on the other hand, failed to submit any evidence in support of its motion. *Id.* Accordingly, the Court had no choice but to deny the City's motion for summary judgment on Plaintiff's claim of exemption.

## III. TRIAL EVIDENCE

In order for Plaintiffs to prevail on their constitutional claims at trial, the burden-shifting scheme set forth in *Alameda Books* and *Peek–A–Boo* initially required them to cast direct doubt on the City's rationales for enacting Ordinances 81–334 and 02–496. Plaintiffs attempted to meet this initial burden primarily through the expert studies and testimony of Drs. Daniel Linz and Randy D. Fisher.[13] Pursuant

12. Contrary to the City's categorical contention that nude dancing in adult entertainment establishments could not qualify under the exemption contained in Ordinance 02–496, the Court simply construed the exemption consistently with the stated intent of Ordinance 02–496:

> The stated intent of Ordinance 02–496 is to "protect and preserve the health, safety, and welfare of [Daytona Beach residents]." Thus, a reasonable interpretation of the ordinance's exceptions ... is that they exempt expressive displays of nudity that the City does not deem to threaten the [residents'] "health, safety, and welfare".... Viewed

accordingly, the City presumably did not consider a "bona fide live communication, demonstration, or performance ... wherein such nudity is expressive conduct incidental to and necessary for the conveyance or communication of a genuine message" to cause the type of secondary effects that prompted [the] enactment of Ordinance 02–496.

Doc. 119 at 27 (bracketing not in original).

13. The curricula vitae of Drs. Linz and Fisher easily establish their collective expertise in the study of secondary effects. *See* Expert Reports at 45–51, 190–216.

to the guidance set forth in *Peek–A–Boo*, Plaintiffs' experts endeavored, first, to demonstrate "that the [City's] evidence does not support its rationale[s]" and, second, to undermine the City's factual findings through studies of their own. 337 F.3d at 1271 (internal quotations and citation omitted).

The City's case rested, in the main, on its pre-enactment evidence for Ordinances 81–334 and 02–496 and the efforts of its attorney to pierce holes in the methodology of Drs. Linz and Fisher on cross-examination. In anticipation of the need to renew support for a theory justifying its ordinances, the City did not present testimony from secondary effects experts of its own, but instead submitted evidence comparable in kind and quality to its pre-enactment evidence.

Plaintiffs also presented the testimony of Sean Bishop ("Mr. Bishop"), a manager at Lollipop's, and Janet Bassett ("Ms. Bassett"), a Lollipop's dancer, in an effort to demonstrate that the dances offered by Lollipop's are "bona fide live ... performance[s] ... wherein such nudity is expressive conduct incidental to and necessary for the conveyance or communication of a genuine message or public expression."

## A. ORDINANCE 81–334

### 1. The City's pre-enactment evidence

The City's rationale for enacting Ordinance 81–334, as expressed in the preamble of the ordinance, is that the combination of nudity and alcohol in public places "encourages the conduct of prostitution, attempted rape, rape, murder, and assaults on police officers in and around establishments dealing in alcoholic beverages, ... begets undesirable behavior, ... [and] that sexual lewd, lascivious, and salacious conduct among patrons and employees ... results in violation of law and dangers to the health, safety and welfare

of the public ...."[14] The City originally supported its rationale with the following evidence: (1) a document entitled "Overview of Problems Dealing with the Investigation of Prostitution and Pornography in the City of Daytona Beach," which mainly detailed the difficulties of Daytona Beach law enforcement in arresting persons engaged in prostitution (hereinafter "Prostitution Overview"); (2) a one-page memorandum written by C.W. Willits ("Chief Willits"), the Chief of the Daytona Beach Police Department, in which Willits attempted to link adult entertainment establishments and crimes such as prostitution, rape, robbery, and homicide (hereinafter "the Willits Report"); (3) police dispatch records of calls for service (hereinafter "CAD data") made in the vicinity of adult businesses from November 1980 to July 1981, which were attached to the Willits Report; (4) police reports of eighty-three prostitution arrests; (5) police reports of seven arrests for the crime of assaulting a police officer; and (6) an attorney and local business owner's first-hand accounts of crimes occurring in and around adult entertainment establishments.

### 2. Plaintiffs' attempt to cast direct doubt on the City's rationale

In an effort to cast direct doubt on the City's rationale for enacting Ordinance 81–334, Plaintiffs' experts first examined whether the City's evidence supported the theory that adult entertainment establishments were the cause of "prostitution, attempted rape, rape, murder, and assaults on police officers." Plaintiffs' experts then attempted to affirmatively demonstrate, through a study of their own, that adult entertainment establishments were not a cause of the adverse effects identified by the City in 1981.

---

**14.** City of Daytona Beach's Closing Argument,     Doc. 170 at 3 (quoting Ord. 81–334).

#### a. Plaintiffs' critique of the City's evidence

Plaintiffs' expert critique of the evidentiary basis for Ordinance 81–334 focused on the Prostitution Overview, the Willits Report and accompanying CAD data, and police reports of arrests for prostitution and assaults on police officers.

#### i. Prostitution Overview

Plaintiffs' experts observed that there was absolutely no empirical data in the Prostitution Overview to support the general allegations contained within it concerning the presence of prostitution and other criminal activity occurring in and around adult entertainment establishments. Expert Reports, at 6–7.

#### ii. The Willits Report and accompanying CAD data

Plaintiffs' experts asserted that the only statistical evidence offered in support of the Willits Report—CAD data from November 1980 to July 1981—lacked reliability for the following reasons:

> The data ... cover areas containing only half of the adult cabarets [in Daytona Beach at the time]. Thus it is selective and incomplete. The [Willits Report] provides no comparison data against which [the data of incidents occurring in and around adult entertainment establishments] can be evaluated. There is no attempt at statistical summary and certainly no attempt to test for statistical significance.

*Id.* at 3. In light of these limitations, Plaintiffs' experts concluded that the CAD data is "shoddy" and, therefore, unreliable

proof of the assertions contained within the Willits Report. *See id.*

#### iii. Reports of arrests for prostitution and assaults on police officers

Plaintiffs' experts concluded that the City's reports of prostitution arrests suffered from "many of the same problems" as the CAD data accompanying the Willits Report, including the lack of any comparison data. *Id.* Plaintiffs' experts also noted that the reports of assaults on police officers "all describe assaults that occurred at businesses other than 'topless bars.' " *Id.*

#### b. Plaintiffs' secondary effects study

In addition to concluding that the City lacked reliable evidence to support its rationale for enacting Ordinance 81–334, Plaintiffs' experts also "performed an empirical study of [their] own to examine the relationship between the presence of adult cabarets in areas and the rates of crime in those areas." *Id.* Using data supplied by the Daytona Beach Police Department, Plaintiffs' experts examined CAD data covering the 44–month time period prior to the enactment of Ordinance 81–334. *Id.* at 19–20. Comparing "rates of crime in study areas that had adult cabarets and control areas that did not,"[15] Plaintiffs' experts "found no statistically significant differences in overall rates of crime[16] between study and control areas." *Id.* at 3–4 (footnote not in original). Accordingly, Plaintiffs' experts concluded that "the presence of adult caberets cannot be seen as a cause of [the crimes identified in Ordinance 81–334]." *Id.* at 4.

---

15. Plaintiffs' experts explained that "[c]ontrol areas were matched as best as possible with study areas to minimize differences between them that might represent alternative interpretation of differences in crime rates." Expert Reports, at 3–4, 20–26.

16. Plaintiffs' experts compared the crime rates for crimes against persons, crimes against property, and sex crimes, such as rape and prostitution. *See* Expert Reports, at 4, 20–21.

## B. ORDINANCE 02–496 (AS AMENDED BY ORDINANCE 03–375)

### 1. The City's pre-enactment evidence

In enacting Ordinance 02–496, the City purportedly sought to curtail "lewd and lascivious behavior, prostitution, sexual assaults and batteries, ... other criminal activity, .. [the] degradation of women, and ... activities which break down family structures and values." Ord. 02–496 (preamble). As support for its rationale, the City relied on the following evidence: (1) local news articles describing nudity during college events and its effects on the community; and (2) narrative reports by detectives and special unit officers describing instances in which dancers at adult entertainment establishments simulated sexual acts, made sexual contact with customers and with each other, and, in one case, propositioned an officer for sex. Doc. 170, Tabs 11–14.

In support of Ordinance 03–375, which amended Ordinance 02–496, the City relied on: (1) Mr. Smith and Mr. Langston's testimony from *Function Junction*; (2) Dr. George's conclusions based on his controlled studies of individuals viewing erotica while drinking alcohol or believing that they were drinking alcohol; and (3) an article published in the *New Statesman* in which the author describes how his experience at an adult entertainment establishment encouraged him to have sex with a prostitute.

### 2. Plaintiffs' attempt to cast direct doubt on the City's rationale

Much as they had approached their critique of the City's rationale for enacting Ordinance 81–334, Plaintiffs' experts attempted to cast doubt on the City's rationale for enacting Ordinances 02–496 and 03–375, first, by systematically analyzing the evidence which the City submitted in favor of the ordinances and, second, by empirically demonstrating that nude entertainment is not the source of adverse secondary effects in Daytona Beach.

### a. Plaintiffs' critique of the City's evidence

Plaintiffs' critique of the City's rationales for enacting Ordinances 02–496 and 03–375 centered on three pieces of evidence: (1) the narrative reports of law enforcement officials describing sexual acts occurring in adult entertainment establishments; (2) Mr. Smith and Mr. Langston's testimony from *Function Junction*; and (3) Dr. George's studies.

### i. Narrative reports of law enforcement

Plaintiffs' experts concluded that the narrative police reports were simply "the unsystematically generated ... result of the police stepping up law enforcement."[17] Expert Reports, at 62. Plaintiffs' experts also observed that:

No comparative information was presented to allow the City to determine if the problems coming to the attention of the police regarding criminal activity were lesser, the same or greater than problems associated with other businesses in comparable locations [and] the information on crime activity did not cover a sufficient period of time to allow for a stable estimate of crime activity. *Id.*

### ii. Mr. Smith and Mr. Langston's Testimony

Dr. Linz concluded that Mr. Smith and Mr. Langston's testimony fell prey to three fatal methodological flaws:

---

**17.** Stepped-up law enforcement simply refers to concentrating law enforcement resources on a particular crime, location, or person.

First, [their testimony did] not compare information on crimes or property values with appropriately selected control areas. Second, what data was examined was not collected over a sufficient period of time to rule out momentary fluctuations in crime events. Third, reliable sources of data from the police were not used and information based on stepped-up police enforcement was relied upon. *Id.* at 163.

### iii. Dr. George's studies

In an extensive critique of Dr. George's laboratory studies, Dr. Linz concluded that the results of the studies cannot not be generalized to the real world setting of nude dancing. Dr. Linz reasoned as follows:

> Dr. George's work illustrates one of the most serious problems with laboratory experimentation. This problem, generally speaking, is known as the problem of "external validity." It relates to the generalizability of experimental findings to the real world. . . .
>
> While there are many reasons for an experiment to lack generalizability[,] one of the most common ways generalizability is jeopardized is when there is an interaction between the testing situation and the experimental stimulus. When there is such an interaction, the effect of interest is produced only in the laboratory not in the real world.
>
> Behaviors might only occur in the laboratory because of the types of people

recruited for the experiment, or because a set of cues given inadvertently to subjects by the setting or experimenter, or because a procedure or set of stimulus materials invented by the experimenter causes subjects to behave in ways they would not in the world outside the laboratory. In addition, even if the behavior in question is not caused by an interaction between the testing situation and experimental stimulus[,] we are still left to wonder if the outcome or dependent variable in the study is analogous to the real world phenomenon of interest.

> Dr. George's studies suffer from all of these external validity problems. There are many interactions between testing situation and experimental stimulus that operate in Dr. George's studies that serve to limit his findings to the social situation he himself has produced in the laboratory. This renders the findings inapplicable to the real world situation of alcoholic beverage consumption in an adult nightclub that features topless or nude entertainment.

*Id.* at 167–68.

Dr. Linz specifically noted the following external validity problems with Dr. George's studies of subjects drinking alcohol while viewing erotica: (1) the use of college-age males who consume more than two drinks per day as subjects;[18] (2) the showing of pornography, including scenes depicting intercourse, fellatio, and cunnilingus; and (3) the absence of real-world

---

18. This phenomenon, Dr. Linz observed, was probably the result of subject participation bias:

> [The] students have been recruited with a procedure in which they must first be informed of the possibility that they will be given alcohol and permitted at that point to excuse themselves from participation. The men who eventually end up taking part in the study presumably underwent informed consent procedures. This means that they were informed of the fact that they may be asked to consume alcohol during the course of the experiment. Proper procedure then permits them to withdraw their participation if this was a problem. We do not know how many men declined to participate at that stage. We may assume however that those who did not wish to drink on school premises or who had study or other obligations may have declined participation in the study.

Expert Reports, at 169.

inhibitors "such as admonishments from friends not to get too drunk, warning from authority figures or at the very least lack of tacit approval by authority figures for excessive drinking, or even the lack of money to 'drink as much' as one wished." *Id.* at 167. Dr. Linz also made the more obvious observation that the bulk of Dr. George's studies did not even involve the use of subjects drinking alcohol.

### b. Plaintiffs' secondary effects study

Despite concluding that the City could not have reasonably enacted Ordinances 02–496 and 03–375 with the evidence it had before it, Plaintiffs' experts nonetheless sought "to test the assumption that adult cabarets are associated with negative secondary effects" by performing "an extensive and detailed empirical study of criminal activity in and around [adult cabarets] in Daytona Beach." *Id.* at 56. Utilizing data provided by the Daytona Beach Police Department, Drs. Linz and Fisher determined "that there is no[ ] support for the City of Daytona Beach's theory that nudity is associated with increases in sex crime incidents such as prostitution or sexual assault." *Id.* at 57. En route to this conclusion, Plaintiffs' experts employed the following methodological approach:

> We first ask[ed]: Does the presence of an adult cabaret in a neighborhood increase the occurrence of crime in Daytona Beach?
>
> In ... answer[ing] this question we considered the entire city using census blocks as the unit of study. We examined demographic variables previously used by criminologists and found to be related to criminal activity, such as a local area's population, age structure (especially the presence of young adults) and race/ethnic composition. We also

examined indicators of social disorganization such as housing vacancies and female-headed households. Finally, we included a variable that measured the number of alcohol retail sale establishments in each block.

> These variables, as expected, were statistically strongly related to crime events in the final analysis. We are able to account for crime events in Daytona Beach with a relatively high level of accuracy (explaining approximately 60 percent of the variability). The social disorganization variables and especially the presence of [ ] alcohol beverage retail sale establishments in the blocks accounts largely for this explanatory power. *The presence of an adult cabaret in the census block accounted for an insubstantial amount of explanatory power.*
>
> We then asked: Does the presence of adult cabarets contribute to increased crime in the local vicinity of these establishments. We focused on the areas surrounding the adult cabarets (1000 foot radius). We found that far from being the source of crime activity, only one to three and [a] half-percent of the crime events could be attributed to the adult cabarets themselves. Instead, *other businesses* in the area, primarily alcohol-serving establishments that do *not* feature adult entertainment, accounted for far more crime events.
>
> Because the City of Daytona Beach specifically maintained that the primary justification for [its] regulation of nudity was because it was associated with increases in prostitution and sexual assaults we undertook a separate set of analyses using each sex crime type as an outcome variable.

*Id.* at 67.[19] Using this approach, Plaintiffs'

---

19. In more precise terms, the methodological approach taken by Plaintiffs' experts involved two procedures:

First, the calls for service to the City of Daytona Beach Police Department across census blocks as defined by the 2000 United

experts specifically found "that often the adult cabarets accounted for zero or near zero percent of the sex crime activity in the near vicinity." *Id.*

## C. THE CITY'S POST–ENACTMENT EVIDENCE IN SUPPORT OF ORDINANCES 81–334 AND 02–496

The City submitted the following post-enactment evidence at trial: (1) testimony from Daytona Beach detective Harry Oakley regarding his observations of oral sex between dancers, drug activity, and propositions for oral sex at adult entertainment establishments in Daytona Beach; (2) a sworn statement from a citizen that he was offered sex at an adult entertainment establishment in Daytona Beach; (3) testimony from another citizen that upon observing sexual acts at Plaintiffs' establishment she was accosted by bouncers and physically removed from the premises; (4) reports of at least three more possible batteries at Plaintiffs' establishment; and (5) the testimony of the City's urban planner, Richard Preoletti, that prostitution does not exist in the parts of Daytona Beach where there are no adult entertainment establishments.

For much the same reasons as he (along with Dr. Linz) concluded that the City's

> States Census Bureau [were] examined. Then, [they] hone[d] in on the areas immediately surrounding the adult cabarets.
> The first strategy [was] to measure the presence or absence of other community features identified at the census block level, city-wide, that may [have been] related to criminal activity and then, once these factors [were] statistically controlled, [the experts] examine[d] the impact of the presence of an adult business on crime activity. These variables [were] entered into a statistical analysis [in order to] explain as much variability in criminal activity as possible. A term [was] then [ ] entered for the presence or absence of an adult cabaret in the neighborhood.

pre-enactment evidence was shoddy, Dr. Fisher testified that the City's post-enactment evidence of batteries and other crimes occurring at adult entertainment establishments is "essentially meaningless." Doc. 166 at 100. Dr. Fisher explained that:

> [T]he main problem ... with the data is that there's nothing to compare it to. [The City] [only focused] on adult cabarets or topless bars.... There is no relevant comparison. [The City] didn't look at other kinds of businesses[.] [S]pecifically they didn't look at ... alcohol only bars.

*Id.* at 101. Dr. Fisher similarly found that Mr. Preoletti's testimony failed "to provide ... an objective test like the correlation co-efficient that tells us whether [adult entertainment and prostitution] are related and ... [whether] the variable that really accounts for [any] correlation [is] alcohol establishments." *Id.* at 104.

Plaintiffs additionally asserted in their closing argument that the City's evidence of batteries is irrelevant because battery was not one of the original justifications for the City's ordinances.

> Secondly, [the experts] follow[ed] up the census block analyses with a more focused analysis on the areas immediately surrounding the adult cabarets (1000 foot radius). Regardless of what [they found] at the census block level, [the experts posited that] it may still be the case that the crime incidents that occur in the block containing the adult cabaret, however small or large, is clustered at the adult cabaret address. This more focused analysis by specific address [was] undertaken to determine if the adult cabarets have required special attention from the police or if other businesses and entertainment establishments in the immediate vicinity [were] more often the source of police attention.
> Expert Reports, at 67.

### D. PLAINTIFFS' EVIDENCE IN SUPPORT OF THEIR CLAIM OF EXEMPTION UNDER ORDINANCE 02–496

Mr. Bishop testified that dancers often choose their own music and outfits based on the themes of their dance performances. *Id.* at 66–67. Ms. Bassett similarly testified that she carefully considers what costumes and music are appropriate for her dance routines. She further testified that her dancing "is an expression of [herself] and how [she] feel[s]" and that she tries "to bring [her] emotions and . . . expression out through [her] dance and music." *Id.* at 86. In disputing the "bona fide" nature of the dance performances offered by Plaintiffs, the City emphasized in its closing argument that the dancers at Plaintiffs' establishment "take their clothes off for money." Doc. 170 at 26.

### IV. COURT'S FINDINGS AND CONCLUSIONS OF LAW

### A. PLAINTIFFS' CONSTITUTIONAL CHALLENGES

Like *Peek–A–Boo*, this case does not present "a battle of competing experts." While Plaintiffs have submitted a sophisticated and detailed expert study that both critiques the City's pre-enactment evidence and empirically examines the relationship between adult businesses and crime in Daytona Beach, the City has consistently maintained that it need not perform any such study. The City instead rests the fate of its ordinances on two arguments: (1) that Plaintiffs' study fails to cast direct doubt on the rationales underlying the ordinances; and (2) that even if Plaintiffs have succeeded in casting direct doubt, the City's evidence at trial renews support for a theory justifying the ordinances.

### 1. Whether Plaintiffs' study has succeeded in casting direct doubt on the City's rationales for enacting Ordinances 81–334 and 02–496

The City does not dispute either that Drs. Fisher and Linz are experts in the study of secondary effects or that the results of their studies are scientifically sound. Instead, the City contends that Plaintiffs' studies of CAD data fail to fully account for the rationales supporting the enactment of Ordinances 81–334 and 02–496.

With respect to Ordinance 81–334, the City contends:

In 1981, the City didn't rely on police dispatch records to determine whether there was a problem-they were one item in the record but the City also looked at prostitution arrest locations, the Police Chief listed specific concerns including murders and missing persons connected with the trade, lewd and lascivious behavior inside, customers assaulted and robbed, dancers assaulted and raped, prostitution inside and out, and the ineffectiveness of current law enforcement tools in curbing these problems. A citizen described the impact on her family restaurant when two neighboring bars went topless, including exposure to extreme violence and drugs. While the "police reports and testimony" of officers from 1981 which the Chief referred to as substantiating the incidents in his memo are not available 25 years later, [P]laintiffs have presented nothing to refute the Chief's credibility. Police dispatch records are not on point. Unreported incidents, activity by detectives, special units, State Attorney investigators, none of that is recorded in CAD [data], and CAD designations often do not accurately reflect real crime. We do have [Smith's] 1987 testimony [in which] he testified from personal knowledge of prostitution and drug activity associated

with the bars, his RICO cases including one of the businesses operating brothels (a record not in CAD). And finally, the City's concerns about its economic future and measures necessary to improve prospects were addressed by [Langston] in [his] 1987 testimony and before this court.

Doc. 170 at 23–24.

Regarding Ordinance 02–496, the City similarly asserts:

> In [2002 and 2003,] the concern was not excessive calls for services ...; no, [the] concerns were lewd behavior inside the clubs; nudity, lewdness, and disruptive behavior on the City's streets; economic harm from the City's reputation as a town where anything goes; [and] criminal behavior attracted by the clubs.... [T]he CAD studies do not "cast direct doubt" on the credibility of the police reports (undercover activity is not in CAD). Dr. George provides a scientific explanation for behavior spiraling out of control consistent with the effects observed by police, and supports the legislative judgment that alcohol and nudity should be separated.

Doc. 170 at 24–25.

■ The City's arguments misapprehend the approach of Plaintiffs' study. Consistent with the framework set forth in *Alameda Books* and *Peek–A–Boo*, Plaintiffs' study initially assessed whether the City's evidence of secondary effects fairly supported the enactment of Ordinances 81–334 and 02–496. In concluding that the City's evidence of secondary effects was "shoddy," Plaintiffs' experts relied mainly on basic methods of scientific reasoning, not CAD data. To illustrate, Plaintiffs' experts did not–nor did they have any need

to-use CAD data to conclude that Dr. George's study "is fraught with external validity problems and [its] leap from laboratory to real world is tenuous at best." Expert Reports, at 188. Nor did they make use of CAD data to conclude that the assertions contained in the Willits Report and in Mr. Smith and Mr. Langston's testimony lack validity because they are based on severely flawed methodology. Indeed, the only time that Plaintiffs' experts used CAD data to assess the quality of the City's evidence it was simply to show that the opinions contained in the Willits Report were belied by the very CAD data that the report relied upon.

CAD data aside, Plaintiffs have succeeded in their attempt to cast direct doubt on the City's rationales for its ordinances. As persuasively demonstrated by Plaintiffs' expert studies, the City's pre-enactment evidence consists either of purely anecdotal evidence or opinions based on highly unreliable data. Most notably, the City's evidence lacks data which would allow for a comparison of the rate of crime occurring in and around adult entertainment establishments with the rate of crime occurring in and around similarly situated establishments. Absent the context that such a comparison might provide, the City's data is, as Plaintiffs assert, "meaningless." As for Dr. George's studies, "external validity problems" render their results irrelevant to the very precise issue of whether there is a causal relationship between specific crimes and the combined effect of drinking alcohol and viewing nude dancing. Although Dr. George is assuredly an expert in something, he has never empirically studied secondary effects, much less secondary effects in Daytona Beach.[20]

---

20. If Dr. George's laboratory studies were accepted as constitutionally sufficient evidence of a link between secondary effects and the combination of drinking alcohol and viewing nude entertainment, the studies, given their highly general nature, would presumably function as a legal basis for *any* municipality to enact an alcohol and nudity ordinance. In the Court's estimation, such a result would render the legal precedent cul-

The doubt created solely by virtue of Plaintiffs' systematic critique of the City's evidence is only cemented by the conclusion of Plaintiffs' experts that, based on the study of CAD data, nude dancing in Daytona Beach is not the source of crime. At trial, the City had the opportunity to undermine the methodology of Plaintiffs' experts but did not do so. Viewed in the very best of lights, the only thing that the City was able to establish at trial is that some criminologists performing secondary effects studies may prefer to rely on data other than CAD data. This does not mean, of course, that CAD data is an unreliable data source. To the contrary, the only testimony of record on this point is that of Dr. Linz, who testified that, notwithstanding any disagreement among criminologists, reliance on CAD data in secondary effects studies is accepted by the criminological community. This is evinced not only by Dr. Linz's testimony but also by the fact that the studies of Dr. Linz have been peer reviewed and published. Given these facts, the Court can only conclude that the methodology of Plaintiffs' experts is sound and that the conclusions they reach regarding the secondary effects of nude dancing in Daytona Beach are, therefore, valid.

**2. Whether the City has submitted evidence renewing support for a theory justifying its ordinances**

The evidence the City offered at trial to renew support for a theory justifying its ordinances suffers from the same flaws as its pre-enactment evidence. Owing perhaps to a stubborn refusal to accept the evolution in the law effected by *Alameda Books* and *Peek-A-Boo*, the City's post-enactment evidence, like its pre-enactment evidence, consists of either anecdotal evidence or opinions based on highly unreliable data. As Dr. Fisher observed, the City fails, once more, to compare any of its data of incidents occurring in and around nude dancing establishments with data of such incidents occurring in and around similarly situated establishments.

In failing to renew support for a theory justifying its ordinances, the City leaves the Court with only one option: to declare Ordinances 81–334 and 02–496 unconstitutional and strike them accordingly. To reach a contrary result would be at clear odds with the plain import of *Peek-A-Boo* that gone are the days when a municipality may enact an ordinance ostensibly regulating secondary effects on the basis of evidence consisting of little more than the self-serving assertions of municipality officials. *See also Flanigan's Enters., Inc. v. Fulton County, Ga.,* 242 F.3d 976, 986 (11th Cir.2001) ("[W]here the right to free speech is at issue, the government bears the burden of showing that the articulated concern has more than merely speculative factual grounds, and that it actually was a motivating factor.").[21]

**B. PLAINTIFFS' CLAIM OF EXEMPTION**

Because the Court has found the City's ordinances unconstitutional, there is no

---

minating in *Alameda Books* and *Peek-A-Boo* mere mockery.

**21.** The Eleventh Circuit's decision in *Peek-A-Boo* complements well its earlier decision in *Flanigan's Enters., Inc. v. Fulton County, Georgia,* 242 F.3d 976, 986 (11th Cir.2001). In *Flanigan's,* the Eleventh Circuit held that the county did not have reasonable justification for amending its nudity ordinance "when

[its] own studies negated the very interests it purportedly sought to prevent." *Id.* at 986. This holding, albeit a decidedly sensible one, may have created an unintended incentive for municipalities: to refrain from performing local empirical studies lest their preconceived ideas about the effects of nude dancing prove false. Yet, for reasons which this Order make clear, *Peek-A-Boo* all but erased any such incentive.

longer occasion to determine whether the dances offered by Plaintiffs fall within the exemption set forth in Ordinance 02–496. Even if there were such occasion, principles of ripeness would likely preclude review.[22] *See Konikov v. Orange County,* 410 F.3d 1317, 1322 (11th Cir.2005) (noting that one of the functions of the ripeness requirement is to ensure that claims are "sufficiently mature" and "issues [are] sufficiently defined and concrete[ ] to permit effective decisionmaking by the court").

## V. CONCLUSION

For all of the foregoing reasons, it is **ORDERED, ADJUDGED, AND DECREED** as follows:

1. Judgment is entered in favor of Plaintiffs Daytona Grand, Inc. and Miles Weiss on their claims that Ordinance 81–334, codified as Code § 10–6 of the Daytona Beach City Code, and Ordinance 02–496, as amended by Ordinance 03–375, violate the First and Fourteenth Amendments of the U.S. Constitution, because the City of Daytona Beach lacks sufficient evidence that the ordinances further a substantial interest in preventing secondary effects associated with adult entertainment.

2. Ordinances 81–334, codified as Code § 10–6 of the Daytona Beach City Code, and Ordinance 02–496, as amended by Ordinance 03–375, are hereby **DECLARED UNCONSTITUTIONAL AND ARE THEREFORE STRICKEN.**

3. The Clerk of the Court is directed to leave this case open for thirty (30) days in order for the Court and the parties to resolve any remaining issues.

---

[22]. Were only Ordinance 02–496 at issue in this case, the constitutional avoidance doctrine might have counseled in favor of initially, and perhaps only, addressing Plaintiffs' claim of exemption. *See Ashwander v. Tenn. Valley Auth.,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("If a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter."). Unlike Ordinance 02–496, however, there are no exemptions contained in Ordinance 81–334 which would have enabled the Court to potentially avoid the constitutional questions raised in this case.